UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEPHEN DILLON and MICHAEL    )
FISHER and others             )
similarly situated,           )
                              )
            Plaintiffs,       )    CIVIL ACTION NO.
                              )    12-12289-DPW
v.                            )
                              )
UNITED STATES OF AMERICA,     )
                              )
            Defendant.        )

MEMORANDUM AND ORDER
January 16, 2019

## I. BACKGROUND

In the Third Amended Complaint now framing this litigation,
Stephen Dillon and Michael Fisher, seamen who claim to have
suffered injury on board government-owned vessels, allege that
they, and similarly situated seamen, are entitled to unearned
overtime wages as part of the unearned wages remedy under
admiralty law. *Cf. Padilla* v. *Maersk Line, Ltd.*, 721 F.3d 77,
82-83 (2d Cir. 2013) (holding in class action that, in some
circumstances, a seaman may be entitled to unearned overtime
compensation as part of his entitlement to unearned wages under
general maritime law).

Plaintiffs move for class certification and summary
judgment for unearned overtime wages.  At the threshold, I
confront the government's contention that it is entitled to

judgment against Dillon based on an affirmative defense unique to him.

Meanwhile, U.S. Marine Management, Incorporated ("USMMI"), the General Agent operating the vessels on the government's behalf, has been permitted to intervene in the action. USMMI has contended that, if the government is granted judgment against Dillon, the case must be transferred to the District of South Carolina, Fisher's residence. The government supports USMMI's contention and has moved to transfer the case to the District of South Carolina if judgment is entered against Dillon.

## II. PROCEDURAL BACKGROUND

Dillon filed the first class action complaint in this case on December 10, 2012. He amended the complaint on February 25, 2013 and again on March 20, 2013. On November 18, 2013, he filed a motion for class certification. I denied his first motion to certify the class without prejudice on June 5, 2014. Dillon then filed a renewed motion to certify the class on December 12, 2014. I denied the renewed motion, again without prejudice, on February 11, 2015. My denials of class certification were based on concerns regarding whether Dillon's individual circumstances would interfere with his ability to be a suitable class representative.

Prior to the set of motions now before me, the parties also filed cross motions [Dkt. No. 51 – Dillon and Dkt. No. 63 – United States] for summary judgment on the government's affirmative defense based on Dillon's alleged failure to disclose his prior medical condition.  I denied those prior motions from the bench, [*See* Dkt. No. 82], on February 11, 2015. I did so on grounds that those motions could not be resolved as a matter of law on the papers and fact-finding would be necessary.  The government now presses for judgment on the same affirmative defense based on the fact-finding I have since conducted.

On May 11, 2015, with the agreement of the parties, I held an evidentiary hearing on the government's affirmative defense, effectively making the determination the subject of a non-jury trial.  During the evidentiary hearing that day, Dillon testified and I am able consequently to assess his credibility. It was evident during that hearing that Dillon, despite offering several unpersuasive excuses and explanations, knew he was failing to disclose his prior medical condition and that if he had made proper disclosure, he would not have been offered the position on the vessel he held when he suffered a medical emergency.

Presumably in light of the testimony on July 27, 2015, Dillon's counsel, now also representing Fisher, brought an

unopposed motion to permit Fisher to intervene as a named representative plaintiff and class representative. To his memorandum in support of his motion to intervene, Fisher attached a proposed third amended class action complaint. I granted Fisher's motion to intervene on February 1, 2016 and the Third Amended Complaint remains the operative pleading in this action.

At a status conference held on November 15, 2017, I continued to express my concerns about Dillon's ability to serve as a class representative. I further discussed with counsel the proposition that Fisher alone could potentially represent the putative class. On January 19, 2018, Plaintiffs filed a motion for class certification, [Dkt. No. 109], and a motion for summary judgment, [Dkt. No. 111], as to the overarching issue of liability for unearned overtime wages. That same day, the government filed its own motion for summary judgment on the merits regarding the claim of Michael Fisher. [Dkt. No. 113].

In connection with its earlier summary judgment motion submissions, the government had filed a separate motion, [Dkt. No. 55], under FED. R. CIV. P. 36(b) to withdraw an admission that provided the foundation for plaintiff's summary judgment contentions. In light of the decision's pertinence to the question of judgment as to Dillon now before me pursuant to non-jury trial procedure, this memorandum provides in Section IV a

full explanation of my February 11, 2015 decision [Dkt. No. 82] to grant the motion to withdraw the admission.

On January 25, 2018, USMMI filed its formal motion to intervene in the action and specifically raised the question of proper venue, along with the potential need to transfer this matter if Fisher became the sole named class representative. The USMMI motion to intervene was unopposed and I granted it. The venue issue is now directly raised in the motion [Dkt. No. 141] of the United States to dismiss or transfer the case if Fisher were to become the sole named putative class representative. My findings and conclusions supporting judgment against Dillon in this litigation are set forth in Sections V and VI of this Memorandum. My reasoning for directing transfer is set forth in Section VII.

### III. PERSONAL AND CLASS ALLEGATIONS

**Dillon** was employed by Maersk Line, Limited ("Maersk"), of which USMMI is a wholly owned subsidiary, to work on a government-owned vessel, the USNS LOPEZ. Maersk operates the vessel under contract with the United States Navy's Military Sealift Command. USNS LOPEZ is part of the Military Sealift Command's Preposition Program, which prepositions ships with military equipment and supplies in strategic locations so that they are available if needed. Maersk hires civilian merchant seamen as crew for vessels, like the USNS LOPEZ, that operate

under contract with the government.

Dillon was hired to serve as a Qualified Member of the Engine Department, a physically demanding job. During the time that Dillon worked on the USNS LOPEZ, it was stationed in Diego Garcia, in the Indian Ocean. Dillon began his employment on the vessel on March 23, 2012 and was discharged on May 29, 2012 because of to a back injury. Dillon was medically repatriated to the United States.

After his injury, Dillon was paid maintenance and cure as well as unearned wages for the period of the vessel's voyage. He alleges that he had an expectation, based on the custom and practice aboard the USNS LOPEZ, that he would have earned and received overtime wages if he had continued to work on the USNS LOPEZ during the voyage. He was not paid any unearned overtime wages after his discharge.

Dillon initially brought this action on behalf of himself and others similarly situated who had not received unearned overtime wages after medical discharge. The proposed class consisted of civilian seamen who had been employed by civilian contractors and had served as crewmembers on vessels owned or chartered by the government and administered by the Military Sealift Command, who had suffered injury or illness in the service of the vessel, and who were paid maintenance, cure, and

unearned wages but not the overtime wages they otherwise would have earned during the voyage.

Dillon is a resident of Massachusetts.

**Fisher**, a member of the American Maritime Officers ("AMO") union, was assigned by his employer, Maersk, to a position as second assistant engineer aboard the USNS HENSON. The USNS HENSON is a public Geographic Survey (or T-AGS) vessel owned by the United States and administered by the Military Sealift Command in its Special Mission program, also known as PM2. T-AGS vessels conduct acoustical, biological, physical, and geophysical surveys and provide much of the military's information on the ocean environment, helping to improve technology in undersea warfare and enemy ship detection.

The government contracts with commercial entities to operate certain public vessels on its behalf, including T-AGS vessels. The Military Sealift Command contracted with 3PSC LLC, which became a subsidiary of Maersk in mid-2012, to operate the USNS HENSON as well as certain other oceanographic survey vessels. 3PSC LLC entered into a collective bargaining agreement ("CBA") and certain subsequent memoranda of understanding with the AMO union.

Fisher boarded the USNS HENSON on February 26, 2015. Under the Articles of Agreement signed by Mr. Fisher, his assignment was not to exceed four months. This was Mr. Fisher's second

assignment as a second assistant engineer aboard the USNS HENSON. He had previously served on the vessel for nearly four months from July 16, 2014 through November 13, 2014.

Fisher was injured aboard the USNS HENSON on June 16, 2015 and was deemed not fit for duty. He was subsequently discharged from the vessel on June 18, 2015. Following Fisher's discharge, Maersk paid him unearned wages in the amount of $231.88 per day — the amount of his daily base wages — through the end of his maximum tour on June 26, 2015. It did not pay him the unearned overtime wages that he contends he would have earned during the voyage.

Fisher is a resident of South Carolina.

### IV. WITHDRAWAL OF THE GOVERNMENT'S ADMISSION AND DILLON'S MOTION FOR PARTIAL SUMMARY JUDGMENT

During the course of discovery, Dillon served multiple requests for admissions, including two requests on July 31, 2014. The July 31, 2014 requested admission at issue in Dillon's motion for partial summary judgment provided that "Defendant does not contend that it would not have hired Plaintiff if he had given what Defendant contends would be his correct responses to the inquiries Defendant has challenged." The government argued that it inadvertently failed to respond to the July 31, 2014 requests and that it would have denied this request for admission if it had responded. However, under FED. R. CIV. P. 36, a party has thirty days after being served with a

request for admission to answer or object to the proposed admission. FED. R. CIV. P. 36(a)(3). If a party does not respond within thirty days with a specific denial, then the matter is deemed admitted. FED. R. CIV. P. 36(a)(3).

Dillon's motion for partial summary judgment against the government's affirmative defense — that his concealment of a pre-existing condition bars the relief requested — was based on this admission. The entitlement to judgment at the heart of the government's current contentions regarding Dillon's participation in this litigation, turns on the admissible evidence regarding the affirmative defense.

Consequently, I now address more fully in writing my oral decision to grant the government's motion to withdraw the admission, before turning to consider various other related matters currently before me.

"A matter admitted under [Rule 36] is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." FED. R. CIV. P. 36(b). I may permit the government to withdraw its admission if doing so would promote the presentation of the merits in this case and would not prejudice the other party in maintaining or defending the action on the merits. FED. R. CIV. P. 36(b). The Advisory Committee's Note to FED. R. CIV. P. 36(b) states that "[t]his provision emphasizes the importance of having the action

resolved on the merits, while at the same time assuring each party that justified reliance on an admission in preparation for trial will not operate to his prejudice." *Farr Man & Co., Inc.* v. *M/V Rozita*, 903 F.2d 871, 876 (1st Cir. 1990) (quoting Fed. R. Civ. P. 36, Adv. Comm. Note).

The government's asserted defense, that Dillon concealed a pre-existing condition and that this bars his entitlement to *any* unearned wages — let alone to unearned overtime — is a central issue in this case. As explained more fully below, the undisputed record evidence is overwhelming - apart from the contested admission - that Dillon made false statements during his pre-employment examination about his prior back injuries and treatment.

What is more, this affirmative defense was asserted in the answer and has been a central theme of the government's arguments and discovery requests during the pendency of this case. *Cf. Zimmerman* v. *Cambridge Credit Counseling Corp.*, 529 F. Supp. 2d 254, 268 (D. Mass. 2008), *aff'd sub nom. Zimmerman* v. *Puccio*, 613 F.3d 60 (1st Cir. 2010) (the proceeding contained "no indication that Defendants were pressing the argument" to which the admission related). I find that the first prong of the withdrawal test has been met; permitting the government to withdraw this admission and fully litigate the issue of concealment or misrepresentation of his prior condition will

"facilitate the development of the case in reaching the truth."
*Farr Man & Co.*, 903 F.2d at 876 (quoting 4A J. Moore & J. Lucas
*Moore's Federal Practice* ¶ 36-08 at 36-79 (2d ed. 1990)).

The second prong of Rule 36(b) concerns prejudice to the
party that requested the admission. FED. R. CIV. P. 36(b) places
the burden to persuasion with respect to prejudice on Dillon.
"The prejudice contemplated by the Rule is not simply that the
party who initially obtained the admission will now have to
convince the fact finder of its truth." *Brook Vill. N. Assocs.*
v. *Gen. Elec. Co.*, 686 F.2d 66, 70 (1st Cir. 1982). Rather, the
prejudice inquiry focused on "the difficulty a party may face in
proving its case . . . because of the sudden need to obtain
evidence with respect to the questions previously answered by
the admissions." *Id.*

To establish prejudice, Dillon points to the fact that, at
his October 28, 2014 deposition, Mark Kelly, of Anderson-Kelly,
referenced documents that had not previously been disclosed in a
response to a request for any documentation related to the
medical examinations. Dillon claims that he was unable to
review the documents referenced by Kelly before the deposition
and that he was unable to re-depose Kelly after reviewing the
referenced document because Kelly's lawyer did not consent to an
additional deposition concerning the previously unidentified
documents. Dillon claims he was sandbagged at the deposition

11

and that he would be prejudiced at this point if he had to try
to prove that he would have been hired anyway.

Dillon does not, however, allege that he relied on the
admission in conducting discovery or in questioning Kelly during
his deposition.  In fact, the deposition of Kelly, including the
numerous questions posed to Kelly about the medical examinations
and the fit-for-duty determinations, illustrates that the
parties continued actively to conduct discovery on this
question.  There is no evidence that Dillon actually relied on
the admission during the course of discovery.  Even if Dillon
had tied the admission itself to his claim of prejudice,
"[c]ases finding prejudice to support a denial [of a motion to
withdraw an admission] generally show a much higher level of
reliance on the admissions." *Hadley* v. *United States*, 45 F.3d
1345, 1349 (9th Cir. 1995) (providing examples of prejudice,
such as a party's attempt to withdraw an admission after the
opposing party showed the admission to a jury, or falsely luring
a party to believe the issue of liability was settled resulting
in cancelation of scheduled depositions); *see also Brook Vill.*,
686 F.2d at 70 (providing example of unavailability of key
witnesses due to a sudden need to obtain evidence on issue
previously answered by an admission).

The government acknowledges that it probably should have
produced a full copy of the Military Sealift Command Medical

Manual, the document referenced by Kelly during his deposition, though it also notes that the document is available to the public and was referenced in numerous other documents. When Kelly declined to be deposed a second time, Dillon did not seek court process to compel a second deposition. While Dillon has pointed to a likely error during the course of discovery, he has not tied this in any way, let alone a way that prejudices him, to the contested admission.

Given the materiality of the subject of the admission and the lack of a showing of prejudice, I permitted the government to withdraw its admission.

## V. DILLON'S MEDICAL HISTORY AND PRE-EMPLOYMENT MEDICAL SCREENING

Based upon the entire record and the evidentiary hearing I conducted to expand the summary judgment record and specifically to assess Dillon's credibility as a predicate to making findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52, I find as follows.

Dillon has a long history of problems with his back. In 1991, he injured his lower back while working on another vessel. He received treatment and medication but was unable to work for a period of time due to that injury.[1] After an initial MRI in

---

[1] I note that, while not mentioned in the parties' respective statements of fact in connection with the summary judgment submissions, in 1991 Dillon's doctor wrote in a letter stating: "He is permanently unfit for duty as a seaman."

1991, Dillon was diagnosed with "spondylolisthesis . . . grade one with a slipping disc" and was told that this is a degenerative spinal disease.  Dillon described the pain he experienced in 1991 as an "electrical feeling," a feeling he admitted having other times between 1991 and 2012.  He also described an "electrical feeling" down his left leg at the time of the most recent injury while working on the USNS LOPEZ, although he initially reported this injury as a strain.

Dillon has suffered chronic lower back problems since the 1991 injury.  Moreover, he strained his neck and shoulder in 1995 and received treatment for his lumbosacral spine.

In September 2000, while working for Central Gulf aboard the GREEN WAVE, Dillon injured his lower back again.  He received treatment at the New England Baptist Hospital Spine Program and returned to work in May 2001.

On August 15, 2001, Dillon had an incident of severe back pain while working on the CAPE DOMINGO.  He went out of work between August 17, 2001 and December 10, 2001.  On January 15, 2002, Dillon injured his back after he had returned to work on the CAPE DOMINGO.  He received treatment for this condition through at least July 2002.  On July 11, 2002, Dillon's treating orthopedist diagnosed him with spondylosis, disk bulge, and moderate stenosis.

Dillon was hit by a car while riding a bicycle in early January 2006.  A new MRI was ordered in February 2006, which again led to a diagnosis of spondylolisthesis with multi-level disc degeneration.  Lower back surgery was recommended for him in 2006.

Dillon applied for Social Security Disability Insurance with an onset date of January 6, 2006 and received SSDI benefits.  The Social Security Administration ordered two Physical Residual Functional Capacity Assessments, one in July 2006 and the other in December 2006.  These assessments found that Dillon's ability to lift and stoop were restricted and that he should be limited to two hours of standing or walking in an eight-hour work day.  Dillon ultimately had to pay back some of the disability payments he received because he returned to work after he was found eligible for benefits.

Dillon was briefly at sea in 2007, and then worked as an electrician on three voyages from January 2, 2008 to May 27, 2008.  In June 2008, after being discharged from the vessel following the voyage, Dillon received acupuncture treatment for back pain.  He again worked as an electrician for less than two months, from December 2008 to February 2009.  In June 2009, Dillon was referred to occupational therapy and acupuncture for back pain.  He had previously also sought a refill of a Vicodin prescription that had been prescribed by a different doctor.

In February 2010, Dillon visited his doctor at Harbor
Health and sought clearance to return to work as well as
documentation of a need for a bathtub bar due to chronic pain.
He was authorized to return to work and approved for
installation of the bar.  The record is not clear about why
Dillon was out of work at that time.  Dillon did not go to sea
again for three years, until he departed on the May 23, 2012
voyage aboard the USNS LOPEZ that led to the relevant injury in
this lawsuit.  During that three-year period, he held a
sedentary job doing gangway watches on a coal boat that called
in Boston.

On February 13, 2012, Dillon attended a pre-employment
medical screening at Logan Health Center as required by Maersk
before a seaman is permitted to serve on a vessel.  Maersk
contracted with Anderson-Kelly Associates, Inc. ("Anderson-
Kelly") to conduct these screenings.  Such screenings include an
examination by a physician based on a medical examination
history questionnaire filled out by the seaman.  After the
screening, Anderson-Kelly designates a seaman as either fit-for-
duty, temporarily not-fit-for-duty, or not-fit-for-duty.  The
examination is directed toward the seaman's medical suitability
to perform the tasks required of him during the voyage.  The
medical examination history questionnaire is designed to elicit
information that is material to Maersk's decision about whether

to hire a particular seaman.  Maersk tries to identify whether seamen have pre-existing conditions because it is liable for employee health, including for any complications from a pre-existing condition that manifest during a voyage.[2]

During Dillon's screening, he filled out and signed a medical examination history questionnaire.  The questionnaire included a list of conditions, one of which was "Back, neck or spine pain trouble or treatment," with a space to check yes or no and a request for the seaman to "fully explain" an affirmative answer.  Dillon checked yes and explained "strained."  In response to the question, "Have you ever had, or have you been advised to have any operations or surgery?," Dillon checked "no."  In response to the question, "Have you ever had illness or injury other than those already noted?," Dillon checked "no."  In response to the question, "Have you ever consulted or been treated by clinics, physicians, healers, or other practitioners within the past 5 years for other than minor illness?," Dillon checked "no."  In response to the

---

[2] It bears noting that Dillon brought four prior personal injury lawsuits concerning ship-based injuries.  These concerned a 1987 hand injury, a 1991 lower-back injury, a 1995 shoulder/neck injury, and a 2000 lower-back injury.  He has brought two additional personal injury lawsuits, one for the 2006 incident when he was hit by a car while bicycling and the other when he was struck by a board falling off a truck on an unknown date. The parties' statements of undisputed facts do not make clear whether Dillon was repatriated during his previous ship-board back injuries, but there is evidence in the record to suggest that he had been.

question, "Have you ever received, or is there pending, or have you ever applied for pension or compensation for any disability or injury?," Dillon checked "no." In response to the question, "Have you ever been medically repatriated and or discharged from any vessel for medical reasons? If yes, why?," Dillon checked "yes" and noted that he was sick in Russia. The examining physician certified that Dillon was fit for duty. Although Anderson-Kelly had Dillon execute an authorization to permit records to be obtained, Anderson-Kelly did not itself undertake to do so. Mark Kelly, the executive vice president of Anderson-Kelly and the company's custodian of records, testified at his deposition, as an administrator overseeing the fit-for-duty determinations, and I find that the standard practice was not to examine outside records absent something triggering such further inquiry.

Maersk expected that Anderson-Kelly would find a seaman to be temporarily not-fit-for-duty and would conduct further inquiry if the seaman was recommended for lower back surgery, had received SSDI payments for a lower back condition, suffered from spondylolisthesis, had a twenty-year history of back problems, or had multiple back injuries while working aboard vessels. When Maersk seeks to hire a seaman with a condition that would be considered disqualifying, Maersk must obtain a waiver from Military Sealift Command's Force Surgeon. If Dillon

18

had been found temporarily not-fit-for-duty, he would not have been permitted to sail on the voyage on the USNS LOPEZ.

As will appear in the fuller discussion of Section VI below, I find as a matter of fact that Dillon intentionally made material misrepresentations and omissions to create the false impression that his medical condition raised no relevant issues about his ability to perform the job he sought. Moreover, I find that, if "proper information had been given," he would not have been engaged for service on the USNS LOPEZ. *See infra* at 32-33.

## VI. CONCLUSION AS TO THE AFFIRMATIVE DEFENSE REGARDING DILLON

The government presses for judgment on the affirmative defense that Dillon's material misrepresentation bars recovery of any relief he seeks in this litigation. The government argues that the misrepresentations I have now found in Section V bar his claims for unearned overtime wages under the so-called *McCorpen* defense.[3]

Maritime law has traditionally afforded a remedy of maintenance and cure for a seaman who suffers injury or becomes sick during his service; in addition, "[a] seaman who is injured

---

[3] The Fifth Circuit's decision in *McCorpen* v. *Central Gulf Steamship Corp.*, 396 F.2d 547 (5th Cir. 1968), is often cited as the origin of this defense, though courts applied a similar approach to such claims prior to that. *See generally, e.g.*, *Tawada* v. *United States*, 162 F.2d 615 (9th Cir. 1947); *Evans* v. *Blidberg Rothchild Co.*, 382 F.2d 637 (4th Cir. 1967).

or becomes sick during his service is granted the wages he would have earned had he been able to complete the contractual terms of his employment." THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 6:29 (6th ed. 2018) (citations omitted). "The right to unearned wages is correlative to the right to maintenance and cure; thus the seaman will be awarded all three or none at all." *Id.* (citations omitted). The more extensive case law on maintenance and cure is instructive with respect to the right to unearned wages, and I rely on that case law in reaching my legal conclusions regarding the defense here.[4]

"The remedy of maintenance and cure is deliberately expansive," and extends to require a shipowner to pay compensation for injuries or illnesses stemming from a preexisting medical condition. *Ramirez* v. *Carolina Dream, Inc.*,

---

[4] I note that Dillon and Fisher had employment relationships with the relevant shipowners and that these relationships provided predicates for negligence actions under the Jones Act. *Brown* v. *Parker Drilling Offshore Corp.*, 410 F.3d 166, 178 (5th Cir. 2005). Dillon's separate Jones Act lawsuit, which was also assigned to my docket, has been settled by the parties. *See Dillon* v. *United States*, Civil Action No. 13-10051-DPW, Dkt. No. 34 (D. Mass, May 22, 2014). Similarly, Fisher's separate Jones Act lawsuit in the District of South Carolina has also been settled. *See Fisher* v. *United States*, Civil Action No. 2:15-03396-PMD, Dkt. No. 26 (D.S.C. October 4, 2016).

The parties have not explored at this point in the litigation whether — and, if so, to what degree — the loss of wages remedy under the Jones Act may give rise to a set off for damages in this litigation. THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 6:29 (6th ed. 2018) ("[W]here loss of wages has been awarded to the seaman in a Jones Act negligence action, there will be a deduction of unearned wages paid to prevent double recovery.") (citations omitted).

760 F.3d 119, 122-23 (1st Cir. 2014).  Indeed, "[t]he doctrine is 'so broad' that the seaman's 'negligence or acts short of culpable misconduct . . . will not relieve the shipowner of the responsibility.'"  *Id.* (quoting *Vella* v. *Ford Motor Co.*, 421 U.S. 1, 4 (1975)).  A shipowner's duty to provide maintenance and cure is meant to "assure its easy and ready administration, for it has few exceptions or conditions to stir contentions, cause delays, and invite litigations."  *Vella*, 421 U.S. at 4.

However, courts have uniformly recognized an exception to this rule arising in circumstances where the seaman engages in culpable misconduct.  Often called the *McCorpen* defense, this exception has taken slightly different forms in different circuits, but generally derives from the principle that "[compensation] will be denied where [a seaman] knowingly or fraudulently conceals his [preexisting] illness from the shipowner."  *McCorpen* v. *Central Gulf Steamship Corp.*, 396 F.2d 547, 548 (5th Cir. 1968).  Courts also agree that, in the absence of a pre-employment medical examination, "a seaman must disclose a past illness or injury only when in his own opinion the shipowner would consider it a matter of importance," and that the burden is on the shipowner to establish that the seaman could reasonably be expected to have considered his medical history a matter of importance.  *Id.* at 548-49; *see also Ahmed*

21

v. *United States*, 177 F.2d 898, 900 (2d Cir. 1949); *Burkert* v.

*Weyerhaeuser Steamship Co.*, 350 F.2d 826, 831 (9th Cir. 1965).

Courts disagree, however, on the scope of the defense in

circumstances where a seaman is required to submit to a pre-

hiring medical examination or interview and the seaman

misrepresents or conceals material medical facts.  In the Fifth

Circuit, and several others, a seaman is not entitled to

maintenance and cure if "(1) the claimant intentionally

misrepresented or concealed medical facts; (2) the non-disclosed

facts were material to the employer's decision to hire the

claimant; and (3) a connection exists between the withheld

information and the injury" for which maintenance and cure is

sought.  *Brown* v. *Parker Drilling Offshore Corp.*, 410 F.3d 166,

171 (5th Cir. 2005); *see also West* v. *Midland Enters., Inc.,* 227

F.3d 613, 617 (6th Cir. 2000); *Wactor* v. *Spartan Transp. Corp.*,

27 F.3d 347, 352 (8th Cir. 1994); *Siders* v. *Ohio River Co.*, 469

F.2d 1093, 1093 (3d Cir. 1972); *Vitcovich* v. *Ocean Rover O.N.*,

106 F.3d 411 (9th Cir. 1997); *Jackson* v. *NCL America, LLC*, 730

F. App'x 786 (11th Cir. 2018) (per curiam).  In these courts,

the examination is "essentially objective inquiry," *Brown*, 410

F.3d at 174, meaning it is "less reliant on determinations of a

seaman's credibility, than other Circuits' comparable tests."

*Id*. at 175.  A "[f]ailure to disclose medical information in an

interview or questionnaire that is obviously designed to elicit

22

such information . . . satisfies the 'intentional concealment' requirement." *Id*. at 174 (quoting *Vitcovich*, 106 F.3d 411).

However, other courts, and in particular the Second Circuit, have chosen a more subjective rule that also considers a seaman's good faith, holding that "concealment of a previous condition is fraudulent only if the seaman knows or reasonably should know that the concealed condition is relevant," even if the employer conducts a medical examination. *Sammon* v. *Cent. Gulf S.S. Corp.,* 442 F.2d 1028, 1029 (2d Cir. 1971). A seaman will still be entitled to maintenance and cure if there was "an honest failure to disclose his prior condition." *Id*.

While the parties discuss rules from various circuits in their memoranda, they do not confront a threshold dimension for me. The First Circuit has never adopted the *McCorpen* defense; nor has it stated that it sides with the Second Circuit on this issue. To be sure, the First Circuit acknowledges that a seaman's culpable misconduct will relieve a shipowner of responsibility for maintenance and cure. *Carolina Dream*, 760 F.3d at 123. The First Circuit in *Carolina Dream* also quoted approvingly language from *DiBenedetto* v. *Williams*, 880 F. Supp. 80, 86 (D.R.I. 1995), that "maintenance and cure may still be awarded plaintiff notwithstanding a pre-existing condition as long as that condition is not deliberately concealed and is not disabling at the time the seaman signs on for the voyage."

*Carolina Dream*, 760 F.3d at 123. The term "disabling" in
*DiBenedetto* was not fully defined, but appears in context to
mean that it would prevent a seaman from performing his duties
on a voyage. *DiBenedetto*, 880 F. Supp. at 87 ("he was not
disabled from his duties as a seaman").

I also look to a trio of cases decided by Judge Aldrich, a
particularly able admiralty judge in the First Circuit, during
his time on this court. In all three, Judge Aldrich held that,
because the obligation to pay maintenance imposes near-absolute
liability on a shipowner, a seaman owes a shipowner a high duty
of good faith in the initiation of employment. *Hazelton* v.
*Luckenbach Steamship Co.*, 134 F. Supp. 525, 527 (D. Mass. 1955);
*see also Fardy* v. *Trawler Comet, Inc.*, 134 F. Supp. 528, 529 (D.
Mass. 1955); *Lorensen* v. *Jenney Manufacturing Co.*, 155 F. Supp.
213, 214 (D. Mass. 1957). "[T]he failure of the seaman seeking
employment to inform the shipowner of a disabling disease of
which the seaman is aware is a breach of duty." *Hazelton*, 134
F. Supp. at 527.

Judge Aldrich treated the obligation of candor as to some
degree subjective, observing that a seaman who may not be aware
of the full extent of his disease and therefore fails to
disclose the condition is less culpable than one who engages in
an "affirmative misrepresentation." *Id*. Disclosure is also
only required "when, in the opinion of the seaman, the shipowner

would consider [the prior medical conditions] matters of importance." *Lorensen*, 155 F. Supp. at 214. If, however, the seaman's belief that he is fit for service or that his condition is immaterial is unreasonable, the seaman has no justification for failing to disclose and this would rise to the level of an affirmative misrepresentation that would relieve a shipowner of liability. *Id.* at 527-28; *see also Fardy*, 134 F. Supp. at 529.

Read together, this trio of cases suggests an approach that is closer to the Second Circuit approach than to a purely objective *McCorpen* defense. Nevertheless, Judge Aldrich's approach in these decisions effectively requires a seaman to disclose information in response to a medical examination, or spontaneously when the condition is sufficiently serious, or else risk being denied maintenance and cure. They do, however, permit some leeway for seamen acting in good faith who fail to disclose a condition they have no reason to know would be material to the shipowner's determination, even after a medical examination.

Two other judges sitting in the District of Massachusetts have addressed similar factual claims. In *Capone* v. *Boat St. Victoria*, No. 85-1656-MC, 1989 WL 47387 (D. Mass. Apr. 27, 1989), Magistrate Judge Collings considered the claims of a seaman with a multi-year "history of chronic low back pain with radiation into the right leg" who had been diagnosed as having

disc degeneration.  *Id.* at *3.  Judge Collings found after trial based on specifics of the seaman's medical history that the shipowner had "failed to prove that [the seaman] held an opinion that his back condition was such that the shipowner would consider it a matter of importance." *Id.* at *6.  Judge Collings also noted, however, that "this would be a different case if the shipowner had inquired as to whether [the seaman] had back problems and [he] denied it." *Id.* at *7.  More recently, in *Stone* v. *Mormac Marine Transport, Inc*., No. 93-12719, 1995 WL 411220 (D. Mass. May 8, 1995), Judge Gertner granted summary judgment to a shipowner where a seaman had failed to disclose prior back or neck complaints during pre-employment inquiries. She observed that "[t]he failure to disclose was hardly inadvertent.  He was expressly asked if he had back problems; he never mentioned it." *Id.* at *3.

With this additional perspective regarding the treatment of a failure-to-disclose defense by judges sitting in this Circuit, I now turn to the parties' arguments about whether the elements that make up an affirmative defense based on deliberate concealment were met here.  It is undisputed that Dillon provided at least some incorrect answers during the medical screening.  For example, he indicated that he had never been recommended for back surgery and that he had never applied for or received disability benefits, although he had done both.

Other answers during the screening were partial or incomplete; for example, when asked whether he had "Back, neck or spine pain trouble or treatment," Dillon checked yes and provided an explanation that, at best, grossly understated the problem.[5]

Because of the lack of definitive guidance from the First Circuit about whether, and to what extent, I may consider Dillon's subjective intent to misrepresent his condition, I conducted an evidentiary hearing to evaluate Dillon's credibility before determining whether judgment should enter against him.

During his testimony at that evidentiary hearing, Dillon acknowledged he wrote down "strained" as an explanation to the "back, neck or spine pain trouble or treatment" inquiry. He explained that "[t]hat's what doctors called it, 'strained or sprained.'" Notably, however, he recognized that his condition was "degenerative" – one that gets worse over time – and that was why he needed a second surgery. Meanwhile, in his application for SSDI, in response to the question "how do your illnesses, injuries or conditions limit your ability to work?," he wrote "I cannot lift the things I need to lift without risking injury to my back," and described his spondylolisthesis as "muscle skeleton problem with bruised flattened spinal cord";

---

[5] Dillon used the term "strain" to refer to his disability injury aboard the USNS LOPEZ, despite the fact the injury was previously determined to be related to his back condition.

"slipping disc that slips and shoots pain in left leg and right arm. Burning pain in chest, back, R[ight] arm."

Dillon's explanation of the term "strained" in the pre-employment medical screening inquiry concerned precisely the medical condition he contended was disabling in his SSDI application. He plainly knew what his condition was and understood its significance for his ability to work, yet he failed to communicate that on his pre-employment medical screening forms. He was a person having significant chronic back pain dating back to 1991 — pain that he had repeatedly maintained was sufficient to hinder his employment ability. It was affirmatively misleading to "explain" that the pain was something that could be described as a modest "strain" not requiring further disclosure, especially when the form itself sought to elicit such information. *See Brown*, 410 F.3d at 174; *Lorensen*, 15 F. Supp at 213.

Dillon observed that he authorized Anderson-Kelly to receive his prior medical records from the Seafarer's Health and Benefits Plan. He appears to suggest that, as a consequence, he did not need to be forthcoming in his answers or fully disclose his medical condition. But intentional omission to state material facts is not excused because the shipowner may have access to other evidence that partially addresses the information that was omitted.

Dillon has also testified specifically regarding the circumstances in which he filled out the employment form. He stated, "I had no glasses in the office. The lights — you're inside, no windows at all." At another point he stated that the questionnaire was in "so small a print, and I'm in a dark room over at the airport. There's no lights. There's no windows, let's put it that way." In addition, he mentioned eye problems when he was asked to look at the questionnaire during the deposition. He said, "I can't—I need reading glasses. It's all blurry and if I strain, everything gets blurry, and I have my glasses at home. I only use them when I read, but if I squint and squint, it could make me lose my vision for distance. It happened to me once." I find this testimony unpersuasive as essentially an expression of willful blindness regarding the questions he was being asked.

During the evidentiary hearing, Dillon testified that back surgery was not "recommended" to him. He asserted that surgery was discussed as something that the doctor could do, and that it was the doctor's job. I find this explanation unconvincing as an excuse for why he answered the employment form inquiries in the negative. When asked at his deposition why he did not mention prior neck problems, he stated "So I made a mistake, but — I overlooked something," as well as "I made a mistake on here. I mean, mistakes happen, but the bottom line is I didn't lie

about broken bones or a back problem, right?  I might have overlooked something."

When Dillon was questioned in his deposition about why he answered "no" in response to the questions about pension or compensation for disability or injury, he answered that he understood the question to refer to pension or disability through the union.  Throughout his deposition when discussing the questionnaire, Dillon repeatedly mentioned that his doctor through the Seafarers International Union had all of his medical records.  Dillon's repeated statements can be understood to mean that he believed that the doctor he saw through the union could be counted on to provide his medical records to Anderson-Kelly during the pre-employment screening permitting them to conduct a thorough review.  This is an unpersuasive effort to distract attention from his own obligation of candor and failure to fulfill it.

Ultimately, Dillon argues that, given his partial disclosure of his back problems by mentioning a history of back strain and given some evidence of his difficulty understanding or even reading much of the questionnaire, the proper question is not merely whether he objectively provided incorrect answers on the medical questionnaire but whether he subjectively believed himself fit for duty at the time he started work on the USNS LOPEZ.  However, even under a subjective standard, Dillon's

arguments fail.  Dillon knowingly provided incorrect answers in a questionnaire – including answering "no" when asked about recommendations for surgery or other significant medical treatment.  His conduct, therefore, constitutes an affirmative misrepresentation rather than a mere failure to disclose. *Hazelton*, 134 F. Supp. at 527.  I find it more likely than not that he did not subjectively believe he was fit for service; in any event, evidence of record fails to support an inference that, given his medical history, such belief would have been reasonable.

Nor can Dillon rely on the fact that he did not understand the nature of his condition or the questions being asked in the questionnaire to defeat the government's defense.  *See generally Ahmed*, 177 F.2d at 900 (holding that an Egyptian seaman who failed to disclose his tuberculosis was entitled to maintenance and cure because his nondisclosure was due, in part, to his weak grasp of English).  There is no basis to conclude that Dillon did not understand his medical condition, and the questions asked of Dillon, a native English speaker, were much more specific than those asked of the seaman in *Ahmed*, the case on which Dillon unpersuasively seeks to rely.

Dillon was aware of his chronic back pain and knew that it, and his generally unstable medical condition, affected his ability to lift on board the vessel, an important duty as part

of his employment.  For these reasons, I find after assessing
his credibility during live testimony, that Dillon should have
known — and indeed did know — that the shipowner would have
considered the non-disclosure to be a matter of importance.  *See
Brown*, 410 F.3d at 175 ("The fact that an employer asks a
specific medical question on an application, and that the
inquiry is rationally related to the applicant's physical
ability to perform his job duties, renders the information
material for the purpose of this analysis.").

Finally, the government has adduced evidence that persuades
me Maersk would have expected a seaman to be found temporarily
not-fit-for-duty if a medical history like Dillon's had been
fully and accurately disclosed.  Whether Maersk might ultimately
have hired him for a different task or to do work in a different
capacity is immaterial.  Evidence before me establishes the
reasons that each of the questions would be relevant to a
determination of whether a seaman is fit-for-duty.  I find that
if the proper information had been given, it would have made
Dillon at least temporarily not-fit-for-duty while a further
review was conducted, and Dillon would not then have been aboard
the USNS LOPEZ in the position for which he was unknowingly
hired when he was injured.[6]

---

[6] Dillon also briefly argues that the medical examinations here
are "pre-voyage" rather than "pre-employment" based on a
characterization in the government's brief.  Regardless of the

Based on the evidence in the record, I conclude that Dillon's course of conduct bars his claims for unearned overtime wages and the government is entitled to judgment on its affirmative defense. As a result, since judgement will be entered against him, Dillon cannot represent the claims of any putative class in this litigation.

## VII. TRANSFER TO THE DISTRICT OF SOUTH CAROLINA

Because Dillon's claims against the United States are barred, Fisher is now the sole named representative of the putative class in this matter and consequently, the case must be transferred to the District of South Carolina, where Fisher resides.

The claims in this action are brought pursuant to the Suits in Admiralty Act, 46 U.S.C. §§ 30901-30918 ("SIAA") and the Public Vessels Act, 46 U.S.C. §§ 3101-31113 ("PVA"). Both statutes are subject to specific venue requirements that limit where a plaintiff may pursue his claims.[7]

---

descriptive label employed, Dillon's examination was one designed to determine medical eligibility for a particular job on a particular voyage and is the type of examination discussed in *McCorpen* and the other cases recognizing this affirmative defense.

[7] The fact that this case is a class action does not alter the operative venue considerations. As a general matter, the same statutory provisions that govern venue for nonclass actions govern in class actions, and may be satisfied only if the named parties satisfy the requirements for venue. *See e.g.*, *United States ex re. Sero* v. *Preiser*, 506 F.2d 1115, 1129 (2d Cir. 1974); *Turnley* v. *Banc of America Investment Services, Inc.*, 576 F. Supp. 2d 204, 212 (D. Mass. 2008).

The PVA, specifically, provides that a civil action involving a public vessel "shall be brought in the district court of the United States for the district in which the vessel or cargo is found within the United States."  46 U.S.C. § 31104(a).  If the vessel is not within the territorial waters of the United States when the action is filed, venue is proper "in the district court of the United States for any district in which any plaintiff resides or has an office for the transaction of business."  46 U.S.C. § 31104(b).

Similarly, the SIAA provides that, in suits in admiralty against the United States, venue is proper in the district court for the district in which "(1) any plaintiff resides or has its principle place of business; or (2) the vessel or cargo is found."  46 U.S.C. § 30906.

The Supreme Court has "h[e]ld that the Public Vessels Act was intended to impose on the United States the same liability (apart from seizure or arrest under a libel in rem) as is imposed by the admiralty law on the private shipowner." *Canadian Aviator, Ltd.* v. *United States*, 324 U.S. 215, 228 (1945).  Moreover, "[t]he Public Vessels Act provides that suits thereunder shall be subject to and proceed in accordance with all consistent provisions of the Suits in Admiralty Act." *Thomason* v. *United States*, 184 F.2d 105, 108 (9th Cir. 1950). Because the SIAA's venue provision is consistent with the PVA's,

I will look to the PVA to determine where venue is appropriate.

It is well settled that venue is proper in the district "in which the vessel [at issue] is physically located at the time the complaint is filed." *Wade* v. *Bordelon Marine, Inc.*, 770 F. Supp. 2d 822, 826 (E.D. La. 2011). *Wade* took the approach that, "under the PVA, there is a succession of venue inquiries, rather than a choice for the plaintiff: first, if the vessel is found within a district when the complaint is filed, venue lies in that district." *Id*. "Second, if the vessel is not found within the territorial waters of the United States, then venue lies where any plaintiff resides (or any district, if no plaintiff resides in any district)." *Id*. "Congress likely intended subparts (a) and (b) to be mutually exclusive and for subpart (b) to apply only as a secondary venue if subpart (a) was not first satisfied." *Id*. at 827.

Because I have found that Dillon cannot represent the claims of the putative class here, the question becomes whether this district is the proper venue for Fisher as the sole potential class representative. The parties have not disputed the contention that, at all relevant points in this litigation, the USNS HENSON, the vessel at issue in Fisher's claim, was outside the territorial waters of the United States.

Under the PVA, then, venue is appropriate where "any plaintiff resides." 46 U.S.C. § 31104. More specifically,

venue is proper only where Fisher, the sole named class representative, resides. *See United States ex re. Sero* v. *Preiser*, 506 F.2d 1115, 1129 (2d Cir. 1974) (Venue "may be satisfied only if the named parties to a class action meet its requirements); *Turnley* v. *Banc of America Investment Services, Inc.*, 576 F. Supp. 2d 204, 212 (D. Mass. 2008) ("[I]n determining whether venue for a putative class action is proper, courts are to look only at the allegations pertaining to the named representatives.").

Under the circumstances, I must conclude venue in this case is proper only in the District of South Carolina, where Fisher resides. The class here may not establish venue in this District through Dillon because he can no longer participate in this litigation. The plaintiff class has also been afforded a substantial period of time within which it might have put forward a named representative who can properly establish venue in this District. It has failed to do so. Accordingly, I have no choice but to direct transfer to the District of South Carolina, where the sole class representative, Fisher, resides.

## VIII. CONCLUSION

For the reasons set forth more fully above, direct the clerk to enter final judgment against Dillon in this litigation. Consequently, I GRANT the motion [Dkt. No. 141] to transfer this case to the District of South Carolina and direct the clerk to

do so based upon the operative pleading of the Third Amended

Complaint in which Michael Fisher is now the sole named class

representative.  Because litigation will continue in the

District of South Carolina, I act no further other than to DENY

without prejudice the motion [Dkt. No. 109] for class

certification and the motions [Dkt. Nos. 111 and 113] for

summary judgment with respect to the remaining plaintiff Fisher,

subject to further proceedings in the District of South

Carolina.[8]


                                   */s/ Douglas P. Woodlock*_____
                                   DOUGLAS P. WOODLOCK
                                   UNITED STATES DISTRICT JUDGE

---

[8] In this connection, I also direct the clerk to terminate as a
motion [Dkt. No. 125] a submission which actually constitutes an
opposition submitted by Fisher's counsel with respect to the
summary judgment motion [Dkt. No. 113] filed by the United
States.  In a similar effort to complete housekeeping regarding
outstanding motions before the case is transferred to the
District of South Carolina, I grant Dillon's motion [Dkt. No.
143] to supplement his opposition to the Government's motion
[Dkt. No. 141] to transfer.